MINNIE M. LAFFERY, *Appellee,* v. THE UNITED STATES
.GYPSUM COMPANY *et al., Appellants.*

No. 16,679.

SYLLABUS BY THE COURT.

1. INDEPENDENT CONTRACTOR—*Contractee Generally Not Liable
for Negligence of Contractor.* The general rule is that when a
person lets out work to another, the contractee reserving no
control over the work or workmen, the relation of contractor
and contractee exists, and not that of master and servant, and
the contractee is not liable for the negligence or improper ex-
ecution of the work by the contractor.

2. —————— *Work Intrinsically Dangerous—Injury to Third Party
—Liability of Contractee.* To the foregoing rule there are
many exceptions and limitations, one of which is that an
owner, or a contractee, is responsible for injuries to a third
party, caused by work done by an independent contractor,
where the contract directly requires the performance of work
intrinsically dangerous, however skillfully done.

3. —————— *Same.* The mere liability to injury from doing the
work contracted for can not be the test, for injuries may hap-
pen in any undertaking, and many are attended with great
danger if carelessly managed, although with proper care they
are not specially hazardous.

4. —————— *Same.* The intrinsic danger of the undertaking upon
which the exception is based is a danger which inheres in the
performance of the contract, resulting directly from the work
to be done and not from the collateral negligence of the con-
tractor.

5. MINES AND MINING—*Negligence of Independent Contractor—
Liability of Mine Owner.* It can not be held as a matter of
law that mining generally is so intrinsically or inherently
dangerous as to make the owner of a mine liable for the negli-
gence of an independent contractor resulting in injuries to a
servant of such contractor, where it is not shown that the mine
was unsafe when the contract was made or that the owner re-
served some control of its operation:

6. INSTRUCTIONS—*Omission to Submit Disputed Question of Fact.*
Where it is a disputed question of fact whether a person who
employed the workmen and superintended the operation of a
gypsum mine was an independent contractor or the superin-
tendent for the owner, it is error to instruct the jury that the

owner is liable for fatal injuries to a laborer employed in the mine, caused by the negligence of the person so superintending the mine, without submitting to the jury the disputed question of fact as to the relation of the superintendent to the owner.

7. EVIDENCE—*Relevancy—Employer's Indemnity Insurance— Agent or Independent Contractor.* Where it was a material question for the jury whether one acting as superintendent of a mine was so superintending it for the owner as its employee, or operating it for himself as an independent contractor, evidence that the owner held insurance indemnifying it against loss and damages from accidents to laborers in the mine, and of the terms of the policy, and of the correspondence between the owner and the insurance company and with the alleged contractor, was competent as tending to show the real relation between the person so superintending the operation of the mine and the mine owner.

8. NEGLIGENCE—*Findings and Evidence.* The evidence is held to be sufficient to sustain the findings of negligence in the operation of the mine, causing the injury complained of, and of the absence of contributory negligence.

.Appeal from Marshall district court. Opinion filed November 5, 1910. Reversed.

*William Warner, O. H. Dean, W. D. McLeod, H. C. Timmonds,* and *H. M. Langworthy,* for The United States Gypsum Company.

*E. A. Berry, W. J. Gregg,* and *J. D. Gregg,* for the appellee.

The opinion of the court was delivered by

BENSON, J.: A judgment was rendered against the United States Gypsum Company and J. E. Drake for damages for the death of George A. Laffery, a laborer in the mines of the company. The defendants appealed, but no brief was filed or argument made for Drake.

The company owns and operates a mill for the manufacture of gypsum products, and owns adjacent mines from which gypsum is taken to supply the mill. The mill and mines were formerly owned and operated by

the Blue Valley Plaster Company. In the year 1900 the plaster company entered into a written contract with Drake, by the terms of which it was agreed that Drake should mine and deliver such gypsum as the plaster company might require at its mills, that company to furnish cars and rails to transport the material from the mine, the deliveries to be at the plaster company's cable, and Drake to receive forty-five cents per ton therefor. The contract contained the following stipulation:

"It is further agreed that said party of the first part shall in nowise have control of the mine from which said gypsum is taken or any authority respecting the manner of, or means employed in and about, mining said gypsum."

This agreement was by its terms to remain in force for one year.

In February, 1905, the plaintiff's husband, a laborer employed by Drake, was killed by a rock which fell from the roof of the mine where he was at work. The plaintiff alleged that the death was caused by the negligence of the defendants in not properly inspecting the mine, and in not furnishing a reasonably safe place in which to work. The defendants answered by a general denial, and pleaded assumption of risk and contributory negligence. The defendant company also specifically denied that Drake was superintending the mine for it or that it was engaged jointly with him in mining.

The jury in answering special questions found that Drake was superintendent of the mine; that the company was negligent in not properly inspecting it; that the room where the deceased worked should have been but twenty feet in width, but was 27½ feet wide; that the superintendent of the mine did not maintain a reasonably safe inspection; that the place where the deceased worked was not reasonably safe, and that his death would have been averted by a reasonably careful inspection. Other findings were made, but they are not

material to this decision. It will be observed that the jury did not find that Drake was superintendent of the mine *for the company*. They were not requested to find on that issue, although quite material.

Drake had been superintendent of the mine for several years before this contract was made, and he continued to direct its operations afterward. In the year 1902 the mills and mines were transferred to the gypsum company, and Drake continued to supervise the operation of the mines until the year 1906. Whether in this supervision after the transfer he acted as superintendent for the company or for himself as contractor, or whether he acted in both of these capacities, were questions of fact; but that he employed and discharged the laborers and superintended the mining generally in removing the material from the earth and delivering it at the mill is not disputed. The claim of the defendant company is that he acted solely as an independent contractor, under the contract with the plaster company, adopted and in force between the transferee and the contractor, the same as though it had been made between them. The claim of the plaintiff is that Drake acted as superintendent of the mines for the defendant company, without reference to the contract, and that the contract was set up as a cover to relieve the company from responsibility for the negligence of its own superintendent. Evidence was offered tending to support the claims of each party. The court, however, in effect, took this question of fact from the jury by the following instruction:

"The owners and operators of a mine and mills engaged in the business of producing and manufacturing plaster from gypsum rock secured from an underground mine by the ordinary process of mining, and which in its nature is dangerous to others, are under obligation to see that it is carefully performed so as to avoid injury, and such person or corporation can not delegate the obligation to an independent contractor

Laffery v. Gypsum Co.

and thus avoid liability in case the work and operation of said mining business is negligently done to the injury of a servant employed in such mining operation, . . . and if you shall be satisfied by a preponderance of the evidence that said George A. Laffery, on the 20th day of February, 1905, while in the performance of his labor as a servant and miner in the Blue Valley Mine in Marshall county, Kansas, and without any fault or negligence on his own part, was killed as the result of the negligent inspection of said mine by the person in the immediate charge thereof and superintendency of the same, or by reason of carelessly and negligently not being provided with a safe place in which to perform his work as such miner, then you must find against both defendants, regardless of any suggestion in the evidence toward the claim that J. E. Drake was solely responsible for such negligence, if any existed."

The plaintiff contends that this instruction is supported by the opinions of this court in *Railroad Co. v. Madden,* 77 Kan. 80, and *Isnard v. Edgar,* 81 Kan. 765. In the Madden case the question was whether a railroad company was liable to a landowner for damages caused by fire set out by a contractor to burn off the right of way—an entirely different question from that presented here, where it is contended by one party that the person injured was the employee of the contractor alone, and by the other party that he was the servant of the owner. The railroad company in that case had a duty to perform which it was bound to discharge in such a manner as not negligently to injure third parties, and it could not in the situation there presented be relieved of that responsibility by committing the work to a contractor. The relation of master and servant did not exist, although an illustration was drawn from that subject. In the Isnard case the plaintiff was employed by the owner of the mill and was injured while working in a place and with appliances furnished by his employer, and it was held that the owner was liable for his own negligence causing the injury. By comparing the claim of the defendant company here,

23—83 KAN·

viz., that Laffery was the servant of an independent contractor, with the situation in either of the two cases relied upon by the plaintiff, it readily appears that they are not controlling.

The general rule, variously stated, is that when a person lets out work to another, the contractee reserving no control over the work or workmen, the relation of contractor and contractee exists, and not that of master and servant, and the contractee is not liable for the negligent or improper execution of the work by the contractor. (Wood, Mas. & Serv., 2d ed., p. 593; 26 Cyc. 1084; 16 A. & E. Encycl. of L. 192.) To this rule there are many exceptions and limitations. (1 Thomp. Com. L. of Neg. §§ 621-627.) One of these exceptions relates to work intrinsically dangerous, and the plaintiff contends that this exception, instead of the general rule, applies here.

It has been held in many cases that an owner, or a contractee, is responsible for injuries to a third party caused by work done by an independent contractor where the contract directly requires the performance of work intrinsically dangerous, however skillfully done. (2 Dillon, Munic. Corp., 4th ed., § 1029.) This principle has been applied to injuries suffered by persons upon streets and highways, and also by occupants of adjoining premises. Another class to which it is held applicable is that of persons invited to come upon the contractee's premises. (Citations are given under various classifications in notes in 65 L. R. A. 833, and 66 L. R. A. 941. See, also, 14 L. R. A. 828.)

No effort will be made to define precisely the expressions "intrinsically dangerous" or "inherently dangerous," or like phraseology, as used in the authorities. Regard must be had to the reason of the principle and the consequences flowing from its application in the given situation.

The mere liability to injury from doing the work contracted for can not be the test, for injuries may

happen in any undertaking, and many are attended with great danger if carelessly managed, although with proper care they are not specially hazardous. Ordinary contracts for buildings, where the owner reserves no control but the usual right to see that the work is properly performed according to specifications, have not been held to be within this principle, although the erection of high buildings in the manner and by the use of materials now common in large cities may be, and often is, attended with great hazards. In an early New York case this matter was discussed in an exhaustive opinion. The court, in speaking of the common case of a person about to build a house, said:

"He may, therefore, let out by contract the building of the house to some person who will undertake to furnish all the materials and complete the building in a specified manner, and for a stipulated compensation. Would he thereby become the master of all the contractor's appurtenances, servants and men employed by him, and render himself liable for all the injuries to third persons which might be occasioned by their negligence or misconduct in doing any act tending to the construction of the house? For instance, by the carpenter's men in getting out timber in the forest; by the stone cutter's servants in blasting stone in the quarry, or by the teamsters in handling materials. Such consequences would indeed shock the common sense of all men." (*Blake v. Ferris*, 5 N. Y. 48, 61.)

In another case of a contract for building, where it was claimed that this exception applied, the court said:

"The exception relied upon is fully recognized by all of the authorities that we have examined, the doctrine being that if the enterprise entered upon by the owner of the premises is inherently and necessarily dangerous, or where danger and hazard must necessarily accompany the work, or where the doing of the work will necessarily create a nuisance, then the prosecution of the work becomes unlawful, and in such cases the owner can not escape personal liability by contracting with another to do the work." (*Richmond v. Sitterding*, 101 Va. 354, 359.)

The court, however, held that the erection of a house

fronting upon a city street was not work of the nature referred to, and that the owner was not liable for injuries caused by the falling of a plank negligently extended over the sidewalk by the contractor.

In *Boomer v. Wilbur*, 176 Mass. 482, in deciding a case where injuries had been suffered from the fall of bricks from a chimney which was being erected under a contract, the court said:

"If the performance of the work will necessarily bring wrongful consequences to pass unless guarded against, and if the contract can not be performed except under the right of the employer who retains the right of access, the law may hold the employer answerable for negligence in the performance of the work. . . . This is not a case where the work, even if properly done, creates a peril, unless guarded against. . . . If it had been necessary for him to topple the chimney over into the street, or to remove the bricks by letting them fall into it, or the contract had contemplated such action, the instructions would not have been objectionable; but as this was not necessary or intended the work could not be classed as work which, if properly done, was ordinarily attended with danger to the public." (pp. 484, 485.)

In *Engel v. Eureka Club*, 137 N. Y. 100, in an opinion by Mr. Chief Justice Andrews, discussing the liability of an owner for the negligence of a contractor whereby a child was killed in taking down a wall, it was said:

"There are cases of still another class where the thing contracted to be done is necessarily attended with danger, however skillfully and carefully performed, or, in the language of Judge Dillon, is 'intrinsically dangerous,' in which case it is held that the party who lets the contract to do the act can not thereby escape from responsibility for any injury resulting from its execution, although the act to be performed may be lawful." (p. 104.)

In *Bower v. Peate,* L. R. (1876) 1 Q. B. Div. 321, Mr. Chief Justice Cockburn said:

"A man who orders a work to be executed, from

which in the natural course of things injurious conse-
quences to his neighbour must be expected to arise,
unless means are adopted by which such consequences
may be prevented, is bound to see to the doing of that
which is necessary to prevent the mischief, and can not
relieve himself of his responsibility by employing some
one else—whether it be the contractor employed to do
the work from which the danger arises or some inde-
pendent person—to do what is necessary to prevent the
act he has ordered to be done from becoming wrongful.
There is an obvious difference between committing
work to a contractor to be executed from which, if
properly done, no injurious consequences can arise, and
handing over to him work to be done from which mis-
chievous consequences will arise unless preventive
measures are adopted." (p. 326.)

It may not be difficult in many cases to apply the dis-
tinction noted in the concluding sentence above, guided
by numerous decisions by which it has been illustrated;
still, cases may arise where the line of cleavage will be
shadowy and indistinct. As remarked by the learned
annotator in 65 L. R. A. 833, 840, "cases which lie near
the border line, and which are not concluded by prec-
edents so close as to be binding, will always continue to
be a source of embarrassment." (See, also, *Hughes v.
Percival*, 52 L. J. [1883], n. s., Q. B. Div. 719.)

In the case of contracts to erect buildings and like
undertakings it should be observed that the contractee
may be liable for injuries if caused by defective plans,
or, in some situations, by excavations necessarily made,
causing injuries not resulting from the collateral neg-
ligence of the contractor but occurring in performing
the contract. (*Wiggin v. St. Louis*, 135 Mo. 558; *Bona-
parte v. Wiseman*, 89 Md. 12.) And manifestly, if the
contract requires for its performance the creation of a
nuisance or the doing of any unlawful act, the employer
is not excused.

It is clear from the cases cited, and many others in
which the subject has been considered, that the intrinsic
danger of the undertaking upon which the exception is

based is a danger which inheres in the performance of the contract, resulting directly from the work to be done and not from the collateral negligence of the contractor. (*Water Company v. Ware*, 83 U. S. 566; *McDonnell v. Rifle Boom Co.*, 71 Mich. 61.) Because of the difficulty of expressing exact distinctions, apart from the facts of particular situations, the language used in many of the decisions must be carefully scrutinized and applied no farther than such facts require.

Passing from this brief review of authorities bearing upon the general subject, we proceed to consider cases relating especially to mining. The owner of a mine had contracted with certain persons to work it and deliver the ore for a specified price per ton. The mine was in safe condition when the contractors took possession. An employee of the contractor was killed by a rock falling from the roof of the mine where he was at work. An action was brought against the mine owner for damages, alleging negligence in failing to keep the mine reasonably safe. In the opinion by Mr. Justice Cooley the duties of a mine owner in such cases are considered at length. It was said:

"That the mine was at no time a place of absolute safety is conceded; but the danger was not peculiar to this mine, and by itself raised no presumption of negligence. . . . The question is whether defendant at the time of delivering possession to the contractors had neglected any precaution which ought to have been taken to guard against danger. We find no evidence of such neglect. The roof remained in place during the season of 1878, and the tendency of the plaintiff's evidence is to show that the freezing of the following winter and the filtration of the water through it were chargeable with the disintegration and ultimate fall of the rock. The negligence, if any, must on this showing have consisted in the failure to inspect the roof frequently, and to bar down any rock that seemed likely to detach itself and fall, or to erect timbers to prevent the fall.·

"But plaintiff insists further that this duty of supervision and care at all times rested upon the mining company, and was not devolved upon the contractors

by the agreement made with them. This is the point on which the plaintiff chiefly relies. It is not pretended that the mere ownership of real estate upon which there are dangers will render the owner liable to those who may receive injury in consequence. Some personal fault must be involved, or neglect of duty, before there can be a personal liability." (*Samuelson v. Cleveland Iron Min. Co.,* 49 Mich. 164, 171.)

After reviewing several cases of injuries to third persons by the negligence of contractors, where it had been claimed that the owner was responsible for fail- .ure properly to care for his own premises, and finding that such responsibility could only be based on some positive duty which the owner owed to the person injured, or upon some duty of a master which could not be delegated, the opinion proceeds:

"It remains to be seen, then, whether a personal duty to guard against danger to the miners was still incumbent upon the defendant as owner of the mine, and was continuous while the mine was being worked by the contractors. Mere ownership of the mine can certainly impose no such duty. The owner may rent a mine, resigning all charge and control over it, and at the same time put off all responsibility for what may occur in it afterward. If he transfers no nuisance with it, and provides for nothing by his lease which will expose others to danger, he will .from that time have no more concern with the consequences to others than any third person. If instead of leasing he puts contractors in possession the result must be the same, if there is nothing in the contract which is calculated to bring about danger. But if, on the other hand, he retains charge and control, and gives workmen a right to understand that he is caring for their safety and that they may rely upon him to guard against negligent conduct in the contractors and others, his moral accountability for their safety is as broad as it would be if he were working the mine in person; and his legal accountability ought to be commensurate with it." (p. 173.)

In an action by a miner to recover for personal injuries suffered in a mine where he was at work for a contractor who had undertaken to mine and deliver coal

to the owner, a verdict was returned against both the owner and the contractor. The owner appealed, and it was held that he was not liable. The injury was caused by a falling roof over an entry. The court said:

"The evidence is undisputed that at the time of the accident, and for some months prior thereto, the mine was in the exclusive possession and control of defendant Dickenson, under a contract with Belshaw, who was the owner thereof; that under such contract Dickenson employed and paid the workmen, had entire charge of and authority over the mine, and received a fixed rate per ton, from Belshaw, for the coal taken therefrom, when the same was delivered to him.

"The principle of law is so well settled that where one carries on an independent employment, in pursuance of a contract by which he has entire control of the work and the manner of its performance, his employer is not liable for any negligence of which he may be guilty in the course of his employment, that the citation of authorities is unnecessary labor." (*Smith v. Belshaw,* 89 Cal. 427, 430.)

It was held in Missouri that a furnace company which owned a sand pit and which had made a contract for digging the sand and hauling it to the furnace at a stated price per load, without reserving any right to control the operation, was not liable for the negligence of the contractor in making an excavation for the pit whereby a third person was injured. (*Fink v. The Missouri Furnace Company,* 82 Mo. 276.)

A contract was let by a mine owner to dig ore and deliver it upon cars furnished by the owner, at a fixed price per car. In an action for the death of an infant wrongfully employed by the contractor, and killed while at the work in the mine, it was held that the owner was not liable. (*Harris v. McNamara et al.,* 97 Ala. 181.)

In another case it appeared that mining operations had been carried on by the mine owners and a contractor, the latter doing the work underground, the owners hoisting and preparing the ore for sale and selling it. The proceeds were divided. Reversing a judg-

ment for the owners, it was held that they were liable for injuries to a laborer underground, the liability being based upon the fact that the undertaking was joint, but the court said:

"The theory on which the defense of the court's ruling is based is that Raynes was an independent contractor, operating the mine on his own account, that the deceased was in his employ holding no contractual relation with defendants and they owed him no duty.

"If the contract between Raynes and the defendants was simply to the effect that the former rented the land, or the mining plant, from defendants, who had no further interest in its operation than that in the nature of a lessor's interest, that theory would be correct.  Although under such conditions it might appear that that mine was in a dangerous condition and unfit for use, yet the miner could look no further than to his employer for redress for his injuries." (*Rice v. Smith,* 171 Mo. 331, 335.)

The reference to the condition of the mine in the concluding sentence of the quotation must have been to its condition at the time of the injury.  If a mine is unsafe when a contract is entered into a different principle would apply.

Where a mining company contracting for the removal of ore reserved to itself arrangements necessary for the protection of the workmen, and a laborer was injured by a rock falling from a hanging wall in the mine, it was held that the mining company was liable, but that the liability arose from its failure to do the thing it had agreed by the terms of the contract to do. (*Lake Superior Iron Co. v. Erickson,* 39 Mich. 492.) In a similar case, where the owners of a mine agreed with the contractor to furnish and put up such props for the roof as would make the mine safe, it was held that they were liable for injuries to an employee of the contractor suffered because of the absence of such props, the liability resting upon the terms of the contract. (*Kelly v. Howell,* 41 Ohio St. 438.)

The principle as applied to mining is also stated in

section 637 of volume 1 of Thompson's Commentaries on the Law of Negligence.

In the absence of legislation upon the subject, the courts have not hitherto held, as a matter of law, that mining generally is so intrinsically or inherently dangerous as to make the owner of a mine liable for the negligence of an independent contractor resulting in injuries to a servant of such contractor, where it was not shown that the mine was unsafe when the contract was made or that the owner reserved some control of its operation. So to hold would go beyond the province of the judiciary.

There is no evidence that the mine was unsafe at the time the contract was entered into or at the time the gypsum company commenced operating it.

If Drake was really acting for the company as its superintendent in overseeing and directing the mining operation by its authority, direction or agreement, or if the written contract was not in force between the company and Drake, or if with or without the contract the company really controlled and directed the operation of the mine, then it is liable for any actionable negligence on his part or the part of the company.

The defendants predicate error on the admission of testimony showing that the gypsum company took out insurance indemnifying it against loss from injuries to Laffery and other laborers, and to the correspondence relating to such insurance, and to the terms of the policy. This testimony was admitted to show the real relation between Drake and the company. It was competent and was properly received. (*Brower v. Timreck,* 66 Kan. 770.)

It is contended that there was no negligence by Drake or the company; that the death resulted from an assumed risk of the deceased; and that it was caused by his own negligence. These claims, however, presented questions of fact determined by the findings of the jury in favor of the plaintiff. We have carefully

examined the evidence and find that it supports the verdict and findings of the jury.

The real relation of Drake to the company should have been determined by the jury under proper instructions. For error in the instruction referred to, the judgment is reversed and the cause remanded for a new trial.

The abstract of the appellant contains over 500 printed pages, embracing a copy of the evidence, with questions and answers in full, and all exceptions thereto, with accompanying remarks of counsel. This is not an abstract, but appears to be a transcript, and is not a compliance with the rules of this court. The expense of printing the abstract will not be taxed as costs.

JOHNSTON, C. J. (dissenting) : In my view the work of mining is intrinsically dangerous, and it therefore devolves on an owner to take reasonable precautions for the safety of those employed in the mines, and an owner can not escape liability for a negligent injury to an employee on the ground that the work was done by a contractor.

GRAVES, J., concurs in this dissent.